# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. CRAIG ALLEN THOMAS, Defendant. | No. CR05-0055-LRR <br><br> **ORDER REGARDING DEFENDANT'S MOTION TO SUPPRESS** |

## I. INTRODUCTION AND PROCEDURAL BACKGROUND[1]

The matter before the court is Defendant Craig Allen Thomas's Motion to Suppress (docket no. 8), which he filed July 8, 2005. On July 13, 2005, the government filed its Resistance to the Motion to Suppress (docket no. 11). Also on July 13, 2005, the court held an evidentiary hearing on the Motion to Suppress. Defendant was personally present and represented by his counsel, Mr. Frank Santiago. Special Assistant United States Attorney Rebecca Goodgame Ebinger represented the government. At the time of the evidentiary hearing, Mr. Santiago indicated he may have additional evidence to present to the court at a later time. On July 21, 2005, the court held a second evidentiary hearing on this matter. Again, Defendant was personally present and represented by Mr. Santiago,

---

[1] On June 9, 2005, the grand jury returned a one-count Indictment against Defendant. Count 1 charges Defendant with knowingly and intentionally possessing with the intent to distribute 50 grams or more of a mixture or substance containing a detectable amount of cocaine base, commonly known as "crack cocaine," a Schedule II controlled substance, on or about May 23, 2005, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A).

and Special Assistant United States Attorney Ebinger represented the government. Therefore, the court finds the Motion to Suppress fully submitted and ready for decision.

## *II. FACTUAL FINDINGS*

On May 22, 2005, a homicide occurred in Chicago, Illinois. Included in the crime scene evidence was an Iowa Identification Card in the name of Markell Rashed Lane with an address of 1001 29th Avenue Southwest, Cedar Rapids, Iowa. The Chicago Police Department thought Markell Rashed Lane might be traveling to Cedar Rapids on a bus. Consequently, on May 23, 2005 at approximately 11:00 a.m., the Chicago Police Department contacted the Cedar Rapids Police Department for assistance, and conveyed its suspicions regarding Markell Rashed Lane to the Cedar Rapids Police Department.

Sometime after 11:00 a.m. on May 23, 2005, Cedar Rapids Police Department Investigator Chip Joecken and Investigator Dale Moyle were given the task of checking the Cedar Rapids ground transportation center or bus station for the Chicago homicide suspect, that is, Markell Rashed Lane. Both investigators were given information received from the Chicago Police Department. Although a memorandum regarding the homicide suspect was sent from the Chicago Police Department to the Cedar Rapids Police Department, the investigators assigned to work the lead did not read it before they were asked to respond.

After learning about Markell Rashed Lane's possible involvement in a homicide and receiving a description of Markell Rashed Lane, Investigator Joecken went to his computer and ran a search on the Linn County Correctional Center booking system. Based on his mid-morning search, Investigator Joecken obtained a 2002 booking sheet which pertained to Markell Rashed Lane. Such sheet included a front profile photograph, a side profile photograph and a physical description. The computer generated photographs depicted

2

Markell Rashed Lane with facial hair (full beard or goatee, mustache and sideburns) and corn row or braided hair. The physical description showed Markell Rashed Lane to be a black male who had been born in 1981, stood five feet eight inches tall and weighed one hundred and forty pounds. He printed the booking sheet out on his printer. *See* Exhibit 1 (printed booking sheet).

After receiving that information, Investigator Joecken and Investigator Moyle drove their vehicle to the ground transportation center in the one hundred block of 5th Avenue Southwest to check the passengers arriving on buses from Chicago. They arrived at the ground transportation center at about 12:15 p.m or prior to the noon bus. On the way to the ground transportation center, Investigator Joecken and Investigator Moyle familiarized themselves with Markell Rashed Lane by looking at the computer generated photographs and the physical description contained in the booking sheet.

When Investigator Joecken and Investigator Moyle arrived at the ground transportation center, they met Uniformed Officer John McDaniel, who had previously learned the arrival times for the Chicago buses. Officer John McDaniel also had a photograph of Markell Rashed Lane and informed Investigator Joecken and Investigator Moyle that the buses coming from Chicago were expected to arrive at 12:20 p.m., 3:30 p.m. and 4:15 p.m. At 12:17 p.m., a bus coming from Chicago pulled into the ground transportation center and parked. Investigator Joecken, Investigator Moyle and Officer McDaniel approached the bus. They strategically positioned themselves around the area where the bus was unloading.

There were not many passengers on the bus. Two black males got off the bus together. Neither the investigators nor the officer approached them because they did not match the description of Markell Rashed Lane. Although they were black males, they were both over six feet tall and both weighed around two hundred pounds or more.

Sometime after they departed, a third black male, that is, Defendant, got off the bus. Defendant had corn row or braided hair, had facial hair, stood about five feet eight inches tall and weighed about one-hundred and forty pounds. He was wearing a black long-sleeved t-shirt, black jeans and black shoes, and he was carrying a black bag. *See* Exhibit 2 (photograph taken of Defendant after he was arrested on May 23, 2005); Exhibit A (printed booking sheet).

After comparing the physical appearance of Defendant with the computer generated image of the homicide suspect or Markell Rashed Lane, Investigator Joecken approached Defendant because he believed Defendant matched the physical description of the suspect. Because he was wearing plain clothes, Investigator Joecken pulled out his police badge and indicated he was a police officer when he approached Defendant. Due to the fact Defendant matched the description of the homicide suspect, Investigator Joecken also put his left hand on Defendant's right arm to control him and to assure officer safety. When Investigator Joecken put his hand on Defendant's arm to control him, he could feel blood rushing through Defendant's arm. Defendant was also nervous and looking around. Because he did not want to engage in a fight or have him run away, Investigator Joecken steered Defendant toward the wall of the ground transportation center and told Defendant he was going to place him in handcuffs for officer safety and for the safety of others. While Investigator Joecken and Defendant were at the wall of the ground transportation center, Investigator Moyle and Officer McDaniel came to Investigator Joecken's location and they helped place Defendant in handcuffs. After Defendant was handcuffed, Investigator Joecken explained to Defendant that a suspect was wanted for homicide in Chicago and that he matched the description of the homicide suspect. Defendant indicated that he understood the situation.

4

Investigator Joecken performed a pat down search for a firearm because he had been informed that the homicide in Chicago involved a handgun. During the pat down search, Investigator Joecken felt some kind of metal object in Defendant's front right pocket (the court assumes the reference is to the pants' pockets), a large amount of U.S. currency in Defendant's front left pocket and some kind of paperwork in the back left pocket. With respect to those items, Investigator Joecken did not take any action at that time.

Investigator Joecken and Officer McDaniel compared the computer generated image of Markell Rashed Lane's face with Defendant's face. They agreed they looked alike. At Defendant's request, Investigator Joecken and Officer McDaniel showed Defendant the photograph. Defendant denied it was a picture of him. Investigator Joecken asked Defendant for his name. Defendant stated his name was Donell Thomas. When Investigator Joecken asked for identification or documentation establishing Defendant's identity, Defendant stated he did not have anything to verify his identity. After obtaining a piece of paper from Officer McDaniel so that he could record Defendant's responses, Investigator Joecken asked Defendant to supply additional information regarding his identity. When asked by Investigator Joecken to state and spell his name and provide his address, Defendant complied. He indicated his name was Donell Allen Thomas and his address was in Country Club Hills, Illinois. After being asked additional questions by Investigator Joecken, Defendant supplied a date of birth, stated he did not know his social security number and indicated he was not employed. Investigator Joecken recorded Defendant's responses.

Investigator Joecken did not believe Defendant. He was familiar with the Country Club Hills suburb of Chicago from a prior investigation. Investigator Joecken knew Country Club Hills was a high income neighborhood. It seemed unlikely to Investigator

Joecken that Defendant, who was twenty-five years old, carried no identification, claimed not to know his social security number and stated he was not employed, could live in a high income neighborhood in Chicago. Defendant's demeanor also influenced Investigator Joecken's perception that Defendant was providing false information.

Officer McDaniel asked Defendant if there was anyone who could be contacted to establish his identity. Defendant gave a phone number for someone in Chicago he identified as his mother, but he did not give her name. He also stated that his brother, Craig Thomas, lived back in Chicago. Investigator Joecken recognized the name Craig Thomas, but he could not initially remember where he previously had heard it.

Because he was still investigating a subject who was wanted for homicide and wanted to be one hundred percent sure who he was dealing with, Investigator Joecken asked Defendant if he could search the Defendant's black bag or look in his pockets for some kind of documentation that would verify his identity. Defendant refused to give consent. Without the consent of Defendant, Investigator Joecken reached into Defendant's back left pant's pocket and removed the papers he had previously felt during the pat down search because he believed they would contain identifying information. Those papers were a one-way bus ticket from Chicago to Cedar Rapids for passenger "Thomas, C." Investigator Joecken did not search Defendant any further or his bag.

Investigator Joecken and Officer McDaniel then moved about ten to twenty feet away from Investigator Moyle and Defendant. At approximately 12:29 p.m., Investigator Joecken or Officer McDaniel contacted the dispatcher and asked them to run the information Defendant had given them. Dispatch reported that there was a driver's license in the Illinois system for a Donell Thomas at the address provided. Dispatch also reported that the height of Donell Thomas was five feet six inches and his weight was one hundred and thirty five pounds. In Investigator Joecken's opinion, Defendant was taller and

6

weighed more than what was reported. Investigator Joecken continued to believe Defendant was not Donell Thomas.

At approximately 12:31 p.m., Investigator Joecken had Officer McDaniel run the name Craig Thomas through the dispatch center because Defendant had mentioned Craig Thomas was his brother and he had remembered the name from a previous investigation. Investigator Joecken previously encountered individuals who had been stopped and who had attempted to identify themselves as a family member to hide their own identity. Based on his training and experience, the use of a family member's identity can be successful because the individual attempting to conceal his or her identity looks similar to the family member and such individual typically knows the family member's date of birth, social security number or other identifying information.

Dispatch advised that Craig Thomas was wanted by the Linn County Sheriff's Office for a mittimus to serve jail time for driving while barred. As far as descriptive information, dispatch could only tell Investigator Joecken that Craig Thomas had a tattoo on his right arm. At this point, Investigator Joecken remembered with more specificity or clarity how he had encountered Craig Thomas in the past. He knew the name from a previous execution of a narcotics search warrant.

Still investigating whether Defendant was or was not Markell Rashed Lane, Officer McDaniel and Investigator Joecken were standing with their backs toward Investigator Moyle and Defendant. Defendant had sat down and was facing south. Officer McDaniel and Investigator Joecken were to the east of Investigator Moyle and Defendant. Officer McDaniel said or yelled "Craig." Apparently hearing his name, Defendant snapped his neck toward Officer McDaniel and Investigator Joecken. After Officer McDaniel and Investigator Joecken confronted Defendant with the fact that he physically responded to the name "Craig", Defendant admitted he was Craig Allen Thomas and acknowledged he

knew a warrant for his arrest existed. At this point, Investigator Joecken became confident that Defendant was not the homicide suspect. After Defendant admitted he was Craig Thomas, officers raised his right sleeve to check if he had a tattoo on his right arm, that is, a tattoo matching the description given by dispatch. He did have a tattoo on his right arm.

Shortly after 12:31 p.m., Defendant was arrested on the mittimus warrant and for providing false information to law enforcement. Approximately thirteen minutes elapsed from the time Defendant was stopped after he disembarked from the bus to the time Defendant was arrested. *See* Exhibit E (event chronology). The officers called dispatch to arrange for Defendant to be transported to the police station. He and his black bag were searched incident to arrest. During the search of his bag, officers saw a pair of brown high top shoes, one white sock, one CD and a cell phone charger. Inside the shoes were two packages wrapped in tin foil that were the size and shape of baked potatoes. Defendant arrived at the police station at approximately 12:42 p.m.

When officers opened the two packages back at the police station, they found those packages contained two hundred forty-six point six grams of crack cocaine (including the weight of the packaging). The current charges arose from that search.

### III. LEGAL ANALYSIS

Federal Rule of Criminal Procedure 12 requires a defendant seeking to suppress evidence to file such motion prior to trial. Fed. R. Crim. P. 12(b)(3)(C). The court must review a pretrial motion before trial unless it finds good cause to defer a ruling. Fed. R. Crim. P. 12(d). A ruling may not be deferred, however, if the deferral will adversely affect a party's right to appeal. *Id.* The court must include in the record its essential findings on factual issues. *Id.*

Defendant moves the court to suppress any and all evidence seized, and any and all statements made, as a result of his May 23, 2005 arrest. Defendant argues the following violations in relation to such arrest: (1) his Fourth Amendment right to be free from unreasonable searches and seizures; (2) his "right to not be [a target] of race-based suspicion"; and (3) his Fifth Amendment right against self-incrimination.

In urging the court to deny Defendant's Motion, the government makes the following arguments: (1) Defendant was lawfully subjected to an investigatory stop; (2) Defendant was not impermissibly targeted for investigation solely based upon race; and (3) Defendant's Fifth Amendment right against self-incrimination was not violated.

### A. Fourth Amendment Right To Be Free from Unreasonable Searches and Seizures

The Fourth Amendment to the United States Constitution guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ." U.S. Const. amend. IV. After a thorough review of the record, the court finds the law enforcement officers' actions on May 23, 2005 did no violence to Defendant's Fourth Amendment rights.

Both investigative stops and arrests are "seizures" for purposes of the Fourth Amendment. *United States v. Miller*, 974 F.2d 953, 956 (8th Cir. 1992). "There is no bright line demarcation between investigative stops and arrests." *Id.* at 957 (citing *United States v. Sharpe*, 470 U.S. 675, 685-86 (1985)). An investigative stop "must be supported by reasonable, articulable suspicion that criminal activity may be afoot, whereas an arrest must be supported by probable cause." *Id.* at 956 (citing *Terry v. Ohio*, 392 U.S. 1, 25-31 (1968)).

> During a *Terry* stop, officers may check for weapons and may take any additional steps "reasonably necessary to protect their personal safety and maintain the status quo during the course

9

> of the stop," *United States v. Hensley*, 469 U.S. 221, 235 . . . (1985), but they must employ the least intrusive means of detention reasonably necessary to achieve the *Terry* stop's purposes. *See Florida v. Royer*, 460 U.S. 491, 500 . . . (1983).

*Id.* at 957. "Numerous cases have held that a police officer's use of handcuffs can be a reasonable precaution during a *Terry* stop." *Id.* (citations omitted).

Here, the Chicago Police Department reported to the Cedar Rapids Police Department that homicide suspect Markell Rashed Lane was believed to be on a bus to Cedar Rapids following a shooting on May 22, 2005. Investigator Joecken, Investigator Moyle and Officer McDaniel had documentation from the Linn County Correctional Center booking system pertaining to Markell Rashed Lane. Such documentation included a photo and a physical description of Markell Rashed Lane from 2002. Defendant exited the bus being observed by the officers. Believing Defendant matched the description of the homicide suspect, the officers confronted Defendant at the ground transportation center, that is, a public place that included individuals who were not a part of the investigation. Defendant bears a close resemblance to the 2002 computer generated photographs of Markell Rashed Lane provided by the Linn County Correctional Center booking system. The differences are easily accounted for by the passage of time. During the three years between the collection of the booking information and the investigation at the ground transportation center, changes in the suspect's physical appearance reasonably could have occurred. Under these circumstances, the officers had reasonable suspicion that Defendant was homicide suspect Markell Rashed Lane.

With respect to the officer's methods of stopping Defendant and investigating his identity, they do not constitute an arrest. The placing of a hand on Defendant's right arm, the steering of Defendant toward the wall of the ground transportation center and the

handcuffing of Defendant falls within the scope of a permissible investigatory stop because the facts surrounding the stop created "a wholly credible concern that [the suspect] might be armed." *See id.* Given their suspicions, the officers had a duty to investigate the identity of Defendant and to take reasonable steps to protect Defendant's safety, their safety, and the safety of the public. *See Adams v. Williams*, 407 U.S. 143, 145-46 (1972). The officers also took diligent and appropriate steps to confirm the identity of Defendant. *See United States v. Sharpe*, 470 U.S. 675, 686-88 (1985). The officers compared Defendant with the computer generated photograph they possessed, asked questions in order to verify Defendant's identity, and attempted to confirm the information Defendant provided by accessing law enforcement records. Defendant's physical response to having his name called by Officer McDaniel, verbal admission that he was Craig Thomas and acknowledgment that he knew a warrant for his arrest existed occurred approximately thirteen minutes following the initial investigative stop by officers. Any delay can be attributed almost entirely to the answers by and conduct of Defendant. Therefore, the court finds the investigatory stop of Defendant did not violate the Fourth Amendment and is consistent with the Supreme Court's holding in *Terry* and its progeny.

Defendant further argues his stop was unreasonable because he alleges the law enforcement officers acted with racial bias. Specifically, Defendant alleges: "it was the officers' 'hunch' or 'mere suspicion' that Mr. Thomas, a black man, traveling from Chicago to Cedar Rapids by a Trailway bus, with an unidentifiable bag, *must be up to something*. . . ." Defendant Brief at 5 (emphasis in original). Defendant's argument is wholly without merit. As described above, the homicide suspect who was the subject of the officers' investigation was an African-American male, approximately 24 years of age, traveling from Chicago by bus. Obviously, officers would not be looking for persons of the Caucasian race in their investigation. Defendant is an African-American male, 25

years of age. Because the homicide suspect for whom the investigators were searching was supposed to be traveling on a bus from Chicago on May 23, 2005 and was similar in race, age, and gender to Defendant (as well as height, weight, hairstyle and facial hair), the court finds the officers did not act with an impermissible bias, race-based or otherwise, when they subjected Defendant to a *Terry* stop on May 23, 2005. This finding is further supported by the fact that two other African-American men exited the bus prior to Defendant without being stopped by the investigating officers.

Finally, prior to Defendant's arrest on May 23, 2005, Investigator Joecken reached into Defendant's back left pocket and removed paperwork. This action was a search pursuant to the Fourth Amendment. *See Arizona v. Hicks*, 480 U.S. 321, 324-25 (1987) (ruling an officer's act of moving a turntable a few inches constituted a search for purposes of the Fourth Amendment). Therefore, the court must undertake a determination as to whether such search was reasonable.

Pursuant to a *Terry* stop, law enforcement officers may only do a pat down search of a suspect's person for weapons to insure the officers' safety. *Miller*, 974 F.2d at 957 (citing *Hensley*, 469 U.S. at 235). When Investigator Joecken did this search, he detected the paperwork in Defendant's back left pocket and suspected it might enable officers to ascertain Defendant's identity with more certainty. Under the circumstances of this case, the subsequent search of Defendant's back pocket was not authorized.

"The Fourth Amendment proscribes all unreasonable searches and seizures, and it is a cardinal principle that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *Mincey v. Arizona*, 437 U.S. 385, 390 (1978) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnotes omitted)). Investigator Joecken did not have

12

a search warrant or an arrest warrant at the time he entered Defendant's pocket. In addition, probable cause did not exist. Therefore, Investigator Joecken's search of Defendant's back pant's pocket was illegal.[2]

Nonetheless, the court declines to suppress the illegally evidence seized. The court finds the doctrine of inevitable discovery applies. The inevitable discovery doctrine provides:

> Illegally seized evidence may be admitted if the Government proves "by a preponderance of the evidence: (1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation."

*United States v. Glenn*, 152 F.3d 1047, 1049 (8th Cir. 1998) (quoting *United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997)).

The first prong of the inevitable discovery doctrine is established. The officers present at the scene of the *Terry* stop shortly after noon on May 23, 2005 had reasonable

---

[2] In *State v. Flynn*, 92 Wis.2d 427, 285 N.W.2d 710 (1979) there is a discussion of whether a police officer can conduct a limited search for identification when a person lawfully detained for investigation under *Terry* refuses to identify himself. Under *Flynn*, the officer would be entitled to conduct a limited search for identification. The court has located no federal decisions that adopt this view. In *United States v. Murphy*, 261 F.3d 741 (8th Cir,. 2001), a defendant stopped for a traffic violation told the police officer he did not have a driver's license or other proof of identification. When defendant pulled out his wallet to show the officer it contained only pictures and no identification, the officer saw a driver's license protruding from the wallet, seized the wallet and removed the license. The Eighth Circuit found this was a lawful plain view seizure of evidence of a crime because, upon seeing the license, it was immediately apparent to the officer that defendant had violated two statutes–not displaying his driver's license and providing the police with false information about his identity.

suspicion that Defendant was a suspect wanted by the Chicago Police Department for a May 22, 2005 homicide. Almost immediately, the officers did not believe Defendant's story that he was Donell Thomas. Because of the heinous nature of the crime being investigated and the fact that officers believed Defendant resembled the homicide suspect, officers would not have released Defendant from custody until they confirmed his true identity. Even without the bus ticket, there is no doubt that the officers would have asked dispatch to run a search on Donell Thomas. Dispatch would have provided information regarding Donell Thomas, including his height and weight. The officers would have compared Donell Thomas' height of five feet six inches and weight of one hundred and thirty five pounds with Defendant's physical attributes. The officers would have concluded that Defendant, who is five feet eight inches and one hundred and sixty pounds, did not match the description of Donell Thomas. Further, given Investigator Joecken's recognition of the fact that he had previously heard the name Craig Thomas in connection with one of his narcotics investigations and his experience with individuals who had been stopped and who had attempted to identify themselves as a family member to hide their own identity, it is likely that Investigator Joecken would have asked dispatch to run a search on Craig Thomas, the name Defendant gave for his brother prior to having Investigator Joecken remove the bus ticket from his pocket. With the information pertaining to Craig Thomas obtained from dispatch, the officers would have confronted Defendant. Based on those facts, there is a reasonable probability Defendant's true identity would have been discovered by lawful means.

The second prong of the doctrine is also established. Apart from unlawfully seizing the ticket from Defendant's back pocket, officers attempted to discern Defendant's identity by asking Defendant additional questions, obtaining information regarding Donell Thomas and Craig Thomas from dispatch and calling "Craig." The court finds such substantial,

alternative line of investigation satisfies the test in this case. *Cf. United States v. Lee*, 356 F.3d 831, 835-36 (8th Cir. 2003); *United States v. James*, 353 F.3d 606, 616-17 (8th Cir. 2003); *United States v. Williams*, 181 F.3d 945, 954 (8th Cir. 1999); *Glenn*, 152 F.3d at 1050; *United States v. Hammons*, 152 F.3d 1025, 1029-30 (8th Cir. 1998). In sum, because it was inevitable that Defendant's true identity would have been discovered, there is no need to suppress this evidence.

### B. Fifth Amendment Right Against Self-Incrimination

The Fifth Amendment prohibits the government from compelling a criminal defendant to be a witness against himself. U.S. Const. amend. V. To effectuate that constitutional guarantee, the United States Supreme Court, in *Miranda v. Arizona*, 384 U.S. 436 (1966), "established a number of prophylactic rights designed to counteract the 'inherently compelling pressures' of custodial interrogation, including the right to have counsel present." *McNeil v. Wisconsin*, 501 U.S. 171, 176 (1991); *see also Missouri v. Seibert*, 542 U.S. 600, 652 (2004) (noting a second purpose of *Miranda* as "reduc[ing] the risk of a coerced confession").

An individual's right to *Miranda* warnings only attaches if the person "is both in custody and being interrogated." *United States v. Head*, 407 F.3d ___, No. 04-1807, 2005 U.S. App. LEXIS 8406, at *5 (8th Cir. May 13, 2005) (citing *United States v. Boyd*, 180 F.3d 967, 976 (8th Cir. 1999)); *see also Miranda,* 384 U.S. at 439.

"Interrogation includes not only express questioning by law enforcement officers, but also words or actions that officers should know are reasonably likely to elicit an incriminating response from a suspect." *Head*, 407 F.3d at ___, 2005 U.S. App. LEXIS 8406, at *5-6 (citing *United States v. Mendoza-Gonzalez*, 363 F.3d 788, 795 (8th Cir. 2004) (in turn citing *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980))). "A statement

made by a suspect that is voluntary and not in response to interrogation is admissible with or without the giving of *Miranda* warnings." *Id.* (citing *Boyd*, 180 F.3d at 977).

The relevant factors to be considered in determining whether the defendant is in custody include his freedom to leave the scene, and the purpose, place, and length of interrogation. *United States v. Griffin*, 922 F.2d 1343, 1348 (8th Cir. 1990) (citations omitted). "While the accused's freedom of action during the interrogation remains a critical factor, the purpose, place, and length factors have been interpreted to have inconclusive independent relevance to the determination of custody." *Id.* The relevant inquiry is how a reasonable person in the suspect's position would have understood the situation. *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984). This objective standard outweighs the suspect's subjective beliefs. *United States v. Boucher*, 909 F.2d 1170, 1174 (8th Cir. 1990).

As the court found above, Defendant was lawfully arrested only after he admitted he was Craig Allen Thomas. Until that admission approximately thirteen minutes into the seizure, Defendant was only stopped for the purpose of investigating whether he was the homicide suspect Markell Rashed Lane. When a suspect is lawfully subjected to an investigatory stop under *Terry*, the suspect is not entitled to a *Miranda* warning. *United States v. McGauley*, 786 F.2d 888, 891 (8th Cir. 1986) (citing *McCarty*, 468 U.S. at 420). As the Eighth Circuit Court of Appeals explained: "One is not free to leave a *Terry* stop until the completion of a reasonably brief investigation, which may include limited questioning. But most *Terry* stops do not trigger the detainee's *Miranda* rights." *United States v. Pelayo-Ruelas*, 345 F.3d 589, 592 (8th Cir. 2003).

Defendant further argues he "had a right to [refrain] from incriminating himself." Defendant Brief at 5. Defendant was lawfully stopped pursuant to *Terry*. "[T]he officer may ask the detainee a moderate number of questions to determine his identity and to try

16

to obtain information confirming or dispelling the officer's suspicions." *United States v. Jones*, 759 F.2d 633, 642 (8th Cir. 1985) ("Limits on the ability of an officer to ascertain the identity of a person could in many instances make investigative stops serve no useful purpose."). The court finds that Defendant voluntarily reacted to having his name called by Officer McDaniel and that Defendant's subsequent admission that he was Craig Allen Thomas and not Donell Allen Thomas was also voluntary. The court finds this argument to be meritless.

### *IV. CONCLUSION*

**IT IS HEREBY ORDERED:**

(1) The court **DENIES** Defendant Craig Allen Thomas's Motion to Suppress, and Request for Hearing (docket no. 8).
(2) The period between the filing of Defendant's Motion and the filing of this Order is excluded from calculation under the Speedy Trial Act. 18 U.S.C. § 3161(h)(1)(F) (excluding delay resulting from the filing of any pretrial motion through the conclusion of the hearing thereon); 18 U.S.C. § 3161(h)(1)(J) (excluding "delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court").
(3) This case will proceed to trial as set forth in the scheduling order.

**IT IS SO ORDERED.**

**DATED** this 8th day of August, 2005.

_____
LINDA R. READE
JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA